IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| REBECCA L. CAMPBELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:14-cv-501-TFM |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Rebecca L. Campbell ("Plaintiff" or "Campbell") applied for disability insurance benefits[1] under Title II of the Social Security Act ("the Act), 42 U.S.C. § 401 *et seq.* After her application was denied at the initial administrative level, Campbell requested and received a hearing before an Administrative Law Judge ("ALJ"), who rendered an unfavorable decision on September 17, 2012, finding Campbell not disabled from the alleged onset date of January 17, 2009, through June 30, 2010, the last date insured. Campbell appealed to the Appeals Council, which rejected review of the ALJ's decision. The ALJ's decision consequently became the final decision of the Commissioner of Social Security ("Commissioner"). *See Chester v. Bowen,* 792 F.2d 129, 131 (11th Cir. 1986). Pursuant to 28 U.S.C. § 636(c), the parties have consented to entry of final judgment by the United States Magistrate Judge. Judicial review proceeds pursuant to 42 U.S.C. § 405(g) and § 1383(c). After careful scrutiny of the record and briefs, for the reasons herein explained, the Court

---

[1]Plaintiff previously sought disability insurance benefits for the period of February 17, 2005, through January 15, 2009. The ALJ denied benefits, and the Appeals Council remanded for further hearing. Tr. 179-95. After a hearing, the ALJ denied benefits on July 22, 2010, finding that Plaintiff would not be disabled if she stopped her substance abuse. Tr. 85-137, 209. The Appeals Council denied review on May 16, 2012. Tr. 221.

REVERSES and REMANDS the Commissioner's decision.

## I. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is a limited one. The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied. *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.3d 1233, 1239 (11th Cir. 1983).

"The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. § 405(g)). Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). Substantial evidence is more than a scintilla--i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Foote*, 67 F.3d at 1560 (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v. Barnhart*, 335 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen*, 796 F.2d 1050, 1053 (11th Cir. 1986)). The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560 (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). The Court "may not

decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth*, 703 F.2d 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*; *Brown v. Sullivan*, 921 F.2d 1223, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

### III. STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[2] *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.[3] Eligibility for SSI is based upon proof of indigence and disability. See 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact

---

[2]DIB is authorized by Title II of the Social Security Act, and is funded by Social Security taxes. *See* Social Security Administration, Social Security Handbook, § 136.1, *available at* http://www.ssa.gov/OP_ Home/handbook/handbook.html

[3]SSI benefits are authorized by Title XVI of the Social Security Act and are funded by general tax revenues. *See* Social Security Administration, Social Security Handbook, §§ 136.2, 2100, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. *Patterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir.1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs. See 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).

> (1) Is the person presently unemployed?
> (2) Is the person's impairment(s) severe?
> (3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[4]
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
> An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4. *See Phillips v. Barnhart*, 357 F.3d

---

[4]This subpart is also referred to as "the Listing of Impairments" or "the Listings."

1232, 1237-39 (11th Cir. 2004). Claimants establish a prima facie case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id.*

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). *Id.* at 1238-39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id.* It also can contain both exertional and nonexertional limitations. *Id.* at 1242-43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines[5] ("grids") or hear testimony from a vocational expert ("VE"). *Id.* at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. *Id.* at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." *Id.*

## IV.  THE ISSUES

**A.     Introduction**

Campbell was 40 years old on her date last insured; she had limited education; and she could

---

[5]*See* 20 C.F.R. pt. 404 subpt. P, app. 2; *see also* 20 C.F . R. § 416.969 (use of the grids in SSI cases).

communicate in English. Tr. 50. Her past relevant work experience was as a janitor and a deli slicer. Tr. 50. She alleges she became disabled beginning on January 17, 2009. Tr. , 292. Following the administrative hearing and employing the five-step process, the ALJ found at Step 1 that Plaintiff had not engaged in substantial gainful activity during the period of her alleged onset date of January 17, 2009, through June 30, 2010, her date last insured. Tr. 43. At Step 2, the ALJ found that Plaintiff suffers from severe impairments of "asthma, obesity, sleep apnea, fatty liver, irritable bowel syndrome (IBS), history of tremors, status post right ankle fracture with hardware placement, bipolar disorder, major depression, generalized anxiety disorder, and history of alcohol abuse (20 CFR 404.1520(c))". Tr. 43. The ALJ then found at Step 3 that Campbell "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments." Tr. 44. The ALJ found that Campbell's mental impairments did not result in at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation under the "paragraph B" criteria. Tr. 45. Next, the ALJ found that Plaintiff has the RFC to perform light work, "except that she could only understand, remember, and carry out simple, single-step, repetitive, and routine tasks." Tr. 46. Following the RFC determination, the ALJ found at Step 4 that Plaintiff was "unable to perform any past relevant work." Tr. 50. Taking into account the VE's testimony, the ALJ concluded that a significant number of unskilled light work jobs exist in the national economy that Campbell could perform with her RFC, including work as a recreation aide, survey worker, and mail clerk. Tr. 50-51, 81-82. Accordingly, the ALJ determined that Campbell "was not under a disability, as defined in the Social Security Act, at any time from January 17, 2009, the alleged onset date, through June 30, 2010, the date last insured." Tr. 51.

**B.     Plaintiff's Claims**

Campbell presents the following issues for review:

1. The ALJ's finding concerning Campbell's RFC was not based on the medical record where:
   a. The ALJ's finding that Campbell was able to perform a broad range of light work activity is not based on the medical record;
   b. The ALJ's finding that Campbell is able to perform jobs requiring only simple, single-step, repetitive, and routine tasks is not based on the medical record;
2. The ALJ erred in Step 5 in finding there is a significant number of jobs in the national economy that Campbell can perform, where the representative jobs, listed by the VE, require a higher level of reasoning than found by the ALJ's RFC.

Pl.'s Br. 1, Doc. No. 15.

## V. DISCUSSION

Campbell raises several issues and arguments related to this court's ultimate inquiry of whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence. *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987). However, the court pretermits discussion of several of Campbell's specific arguments because the court concludes that the Commissioner erred as a matter of law on Campbell's issue regarding her mental RFC, and thus, this case is due to be remanded for further proceedings.

### A.     Campbell's Mental RFC

Campbell argues the ALJ's finding that she can perform "simple, single-step repetitive and routine tasks" was not supported by the psychological record, and the ALJ erred in giving little weight to the opinion of her treating psychiatrist, Dr. Lopez, and her treating psychotherapist, June Johnson. Doc. No. 15, at 11-13. To the extent Campbell argues the ALJ's nonexertional RFC was not based on substantial evidence in the record, the Court agrees the case must be remanded.

In determining the RFC, the ALJ generally acknowledged the medical evidence of record

for Campbell's treatment for bipolar disorder, major depression, and generalized anxiety disorder. Tr. 48. Without identifying any particular timing of her mental health care throughout the relevant seventeen months from January 17, 2009, through June 30, 2010, the ALJ noted that her complaints of "anxiety, stress, panic attacks, depression, irritability, profound anhedonia, frequent crying spells, diminished self-esteem, desire to sleep, and lack of energy and motivation," as well as "her reports of feeling better, lack of feeling depressed, and lack of manic episodes." Tr. 48. The ALJ listed her "depressed mood, anxious mood, angry mood, depressed affect, labile mood and affect, impoverished speech, verbose speech, tense motor activity, poor attention span and concentration, disorganized thought process, ruminating thought process, loose association, poor memory, and poor judgment and insight," and with "her good grooming, pleasantness, alertness, orientation, appropriate affect, organized thought process, normal association, average intelligence, cooperative behavior, and fair attention and concentration." Tr. 48. The ALJ did not mention Campbell's diagnosis of depression with psychotic features, but he did note that Campbell "was treated with various psychotropic and sleep medications," Tr. 48, and that "[h]er psychotropic medications would work for a while and then stop working, Tr. 46.

The ALJ then found that Campbell can perform "simple, single-step, repetitive, and routine tasks," explaining:

> As for her mental impairments, although she had *some problems,* her good grooming, pleasantness, alertness, orientation, appropriate affect, organized thought process, normal association, average intelligence, cooperative behavior, and fair attention and concentration were noted on examination during the period from January 17, 2009 through June 30, 2010 (Exhibits C7F, C8F, C9F) [Tr. 428-78]. The undersigned notes that after the claimant's dosage of Xanax was increased during a visit to the Wiregrass Wellness Center on May 5, 2009, she *apparently did not seek out psychiatric care again until her visit to Alabama Psychiatric Services on May 25, 2010*, when it was noted that she had not been taking her medications (Exhibit C15F) [Tr. 589-90]. The undersigned acknowledges that the claimant began treatment with

>   SpectraCare on August 10, 2010 (Exhibits C2F, C4F, C13F, and C14F) [Tr. 383-401, 404-09, 556-88]. However, this was more than a month after the date last insured, and her stress level had apparently been increased after she found out that her husband had been unfaithful to her (Exhibit 1CF) [Tr. 349-82].
>
>   As for opinion evidence, on July 25, 2012, Fernando Lopez, M.D., the claimant's psychiatrist at SpectraCare, completed forms indicating that the claimant had multiple marked and extreme mental limitations (Exhibit C14F) [Tr.585-88]. Dr. Lopez indicated that the severity of the claimant's limitations had probably existed "long before" she became a patient of SpectraCare on August 10, 2010. The undersigned gives little weight to Dr. Lopez's opinion. Although he is a treating medical source, he gave his opinion more than two years after the date last insured, and he did not begin treating the claimant until more than a month after the date last insured. As discussed above, although the claimant had mental limitations, the evidence of record from January 17, 2009 through June 30, 2010, taken as a whole, shows that the claimant was able to perform a range of unskilled work with simple, single-step, repetitive, and routine tasks.

Tr. 49 (emphasis added).

June Johnson, Campbell's mental health therapist, and Dr. Lopez, Campbell's treating psychiatrist at SpectraCare, completed a Mental Residual Functional Capacity Assessment and indicated that Campbell had marked or extreme limitations in nearly every mental area. Tr. 586-88. Dr. Lopez said Campbell had those limits "probably long before" she became a patient on August 10, 2010. Tr. 587. The ALJ gave Dr. Lopez's opinion little weight because Dr. Lopez "gave his opinion more than two years after the date last insured, and he did not begin treating the claimant until more than a month after the date last insured." Tr. 49.

### B.     The ALJ's Decision Regarding Mental RFC Limitations Must Be Remanded

"Where the medical record contained a retrospective diagnosis, that is, a physician's post-insured-date opinion that the claimant suffered a disabling condition prior to the insured date, [the court may] affirm only when that opinion was consistent with pre-insured-date medical evidence." *Mason v. Comm'r of Soc. Sec.*, 430 F. App'x 830, 832 (11th Cir. 2011) (citations

omitted). It is true, as the Commissioner points out, Doc. No. 16, at 7, that Campbell's medical records during her insured status before the ALJ do not indicate any "marked" or "extreme" functional limitations.[6] Even assuming, however, that the ALJ had good cause to reject Dr. Lopez's medical opinion, the court cannot conclude the ALJ's decision regarding Campbell's mental work limitations is supported by substantial evidence.

Campbell argues that, by giving little weight to the only mental health opinion he cited, the ALJ imposed his own uninformed opinion, rather than relying on a mental health professional, to conclude that Campbell could perform "simple, single-step, repetitive, and routine tasks." Doc. No. 15, at 12-13. It is the ALJ, not medical caregivers, who is responsible for determining the RFC, and there is no requirement for the ALJ to rely on an RFC assessment by a physician. *See Green v. Social Security Administration*, 223 F. App'x 915, 923-24 (11th Cir. 2007) ("Once the ALJ determined that no weight could be placed on Dr. Bryant's opinion of the Green's limitations, the only documentary evidence that remained [showing she could perform light work] was the office visit records from Dr. Bryant and Dr. Ross that indicated that she was managing her respiration problems well, that she had controlled her hypertension, and that her pain could be treated with over-the-counter medication. Thus, substantial evidence supports the ALJ's determination that Green could perform light work. The ALJ did not substitute his judgment for that of Dr. Bryant; rather, he determined that Dr. Bryant's opinion was inconsistent with objective medical evidence in the record.

---

[6]In a prior proceeding, a different ALJ found Campbell had marked difficulties in social functioning based, in part, on her July 2009 involuntary commitment to the Southeast Alabama Medical Center after she attacked her husband with a kitchen knife. Tr. 203. During her involuntary commitment, Shakir Meghani, M.D., diagnosed Campbell "with bipolar mood disorder with psychotic symptoms, post traumatic stress disorder and alcohol and substance issues." Tr. 205.

"). However, this court concludes, in Campbell's case the ALJ's decision does not demonstrate that the ALJ considered all of the relevant and probative evidence in determining that the record as a whole shows Campbell can perform light work with simple, single-step, repetitive, routine tasks.

For example, the ALJ did not mention that on April 6, 2009, Dr. J. Chris Strunk, Campbell's treating psychiatrist at the Wiregrass Wellness Center, diagnosed Campbell with major depression with psychotic features and generalized anxiety disorder. Tr. 441. Although on May 5, 2009, Dr. Strunk noted that Campbell had no psychotic thoughts, Dr. Strunk stated her attention span and concentration were poor, she "continue[d] to struggle with antidepressant therapy," and, as the ALJ noted, Dr. Strunk increased her Xanax dose. Tr. 440. In addition, the ALJ erroneously states that Campbell did not seek psychiatric care from May 5, 2009, until May 25, 2010. In fact, Campbell was hospitalized in July 2009 for what her primary care physician, Dr. Diana M. Mancuso, said "sounds like bipolar disorder. She is on a multitude of medications." Tr. 356. At her visit with Dr. Mancuso at the end of July 2009, Campbell was taking, among other things, Protonix, Ambien, Effexor, Geodon, and Lithium. Tr. 357. Campbell was prescribed Xanax throughout that year from Dr. Mancuso. Tr. 350-64. On November 17, 2009, Dr. Mancuso noted that Campbell began but did not complete an appointment for bipolar evaluation. Tr. 360. Campbell stated she did not want to go back to Dr. Strunk or Dr. McDowell, and Dr. Mancuso noted, "Bipolar disorder. She needs to be on meds for this." Tr. 360. Dr. Mancuso stated Campbell would "check with her insurance company to see which Psychiatrist in town that they will cover and we can get her in for a bipolar evaluation." Tr. 360. Dr. Mancuso further noted on November 17, 2009, that Dr. Meghani was covered by Campbell's insurance, and Dr. Mancuso gave Campbell enough Xanax "to last until she can get in with Dr. Meghani." Tr. 361. About a month later, Dr. Mancuso noted that Campbell's appointment

with Dr. Meghani was for December 21. Tr. 361. On January 21, Dr. Mancuso noted that Campbell had an appointment with SpectraCare for February 15, 2010. Tr. 364. On March 8, 2010, Dr. Mancuso said Campbell had "[a]nxiety, depression and history of bipolar disorder and at least major depression with psychotic features" and "[p]ossible ADHD." Tr. 363. Campbell apparently saw Dr. Hicks on March 16, 2010, and she wanted a prescription for Adderall, which a relative had given to her. Tr. 363. Dr. Hicks did not feel the Adderall was in her best interests because she had bipolar disorder, and he indicated that she refused to take the Risperdal he prescribed earlier. Tr. 363. On April 12, 2010, Dr. Mancuso noted that Campbell felt anxious and not particularly depressed, but she "does have a history of bipolar disorder but basically discharged Dr. Hicks from her care as per his last note of 3/16/10." Tr. 362. Dr. Mancuso continued Campbell's prescription for Xanax and added Buspar. Tr. 342, 268. On May 3, 2010, Dr. Mancuso noted that Campbell was doing "fairly well on Buspar." Tr. 367. On May 25, 2010, Campbell reported noncompliance with medications for six weeks. Tr. 590. Between January 2010 and June 2010, Campbell was prescribed several psychoative drugs for depression, psychotic symptoms, mood stabilization, and anxiety. Tr. 342. Consequently, it was not accurate for the ALJ to say Campbell "did not seek out psychiatric care" from May 2009 to May 2010, and the ALJ did not fully explain what he meant by "some problems" in mental impairments for Campbell.

    The ALJ also did not mention that Dr. Robert Estock completed a Psychiatric Review Technique on November 4, 2010. Dr. Estock identified some of the notes from Dr. Mancuso and SpectraCare in 2010, but Dr. Estock stated that Campbell did not return forms to Dr. Estock, consequently he had insufficient evidence to rate the severity of her impairments. Tr. 410-23. Without acknowledging this evidence, the ALJ determined that Campbell was capable of performing

simple, single-step, repetitive, and routine tasks. The gap in the ALJ's analysis is evident by comparing the ALJ's step three discussion with the RFC finding. At step three, the ALJ found:

> With regard to concentration, persistence, or pace, the claimant had moderate difficulties. She testified she had trouble concentrating and focusing. Her disorganized thought process, loose association, poor memory, and poor judgment and insight were noted during her visit to the Wiregrass Wellness Center on April 6, 2009 (Exhibit C8F) [Tr. 439-49]. Her poor attention span and concentration were noted during her visit there on May 5, 2009. However, her alertness and orientation were noted during her gastroenterology consultation with Dr. Tarwater on February 10, 2009, and during a visit to ENT Care on October 28, 2009 (Exhibits C7F and C9F) [Tr. 427-38, 450-78]. Her organized thought process, fair attention and concentration, and moderate judgment and insight were noted during her visit to the Wiregrass Wellness Center on February 2, 2009 (Exhibit C8F). [Tr. 439-49]. Her normal association and average intelligence were noted during her visit there on May 5, 2009.

Tr. 45. The only limitations in the RFC that relate to Campbell's moderate difficulties in concentration, persistence, and pace are the limitations to performing simple, single-step, repetitive, and routine tasks. Tr. 45-46. Without medical evidence that Campbell remains capable of performing this simple work on a sufficiently sustained basis *despite* her moderate limitations in concentration, persistence, and pace, however, the RFC mental limitation does not account for Campbell's difficulties in maintaining concentration, persistence, or pace. *Cf. Winschel v. Commissioner of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (noting, with approval, that "[o]ther circuits have also rejected the argument that an ALJ generally accounts for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question [to the VE] to simple, routine tasks or unskilled work. . . . But when medical evidence demonstrates that a claimant can engage in [those tasks], courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations.") (citations omitted) (emphasis added); *Richter v. Commissioner of Soc. Sec.*, 379 F. App'x 959, 962 (11th Cir. 2010) ("[W]e conclude that the ALJ's

failure to include all of Richter's impairments in his hypothetical question was error. This error was not harmless because the inquiry conducted by the vocational expert did not implicitly account for Richter's deficiencies in concentration, persistence, and pace. Additionally, there is no medical evidence that, despite these limitations, Richter nevertheless retained the ability to perform simple, repetitive, and routine tasks or unskilled labor."); 20 C.F.R. Pt. 404, Subpt. P, App. 1, ¶ 12.00(C)(3) ("Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."); SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996) ("RFC is an assessment of an individual's ability to do sustained work related physical and mental activities in a work setting on a regular and continuing basis."). The holding in *Winschel* was in the context of a VE's testimony at step five, but the rational applies equally to the RFC determination that a claimant can do simple, unskilled in light of moderate deficits in concentration and attention. *See Griffin v. Colvin*, 2015 WL 6438518, at * 5 (M.D. Ala. Oct. 22, 2015) (citing cases). The ALJ gave little weight to the only medical opinion evidence on which he relied in formulating the mental limitations, and the court finds no medical opinion of record indicating that Campbell can sustain concentration, persistence, and pace sufficiently to perform simple, single-step, repetitive, and routine tasks. Furthermore, contrary to the Commissioner's statement that "the ALJ evaluated the medical evidence of record" and "considered the evidence, including the documentary evidence," Doc. No. 16, at 7, it does not appear from the ALJ's opinion that he considered all the medical evidence. As discussed, the ALJ inaccurately stated that Campbell did not seek psychiatric care from May 2009 to May 2010, including omission of her hospitalization in July 2009 for bipolar disorder.

It is the claimant's burden to prove her disability. *Green*, 223 F. App'x at 923. Here,

however, the ALJ's decision includes evidentiary gaps and fails to consider all of the probative evidence related to Campbell's mental limitations. The court cannot conclude that the ALJ's mental RFC limitations, including the conclusion that Campbell remains capable of performing simple, one-step, repetitive, and routine tasks despite her moderate difficulties in concentration, persistence, and pace, are supported by substantial evidence of record. *See Keeton*, 21 F.3d at 1066 (failure to provide "sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal"). This Memorandum Opinion does not suggest Campbell is entitled to disability benefits. Rather, it speaks only to the process the ALJ must engage in and the findings and analysis the ALJ must make before determining whether Plaintiff is disabled within the meaning of the Social Security Act. *See Phillips v. Barnhart*, 357 F.3d 1232, 1244 (11th Cir. 2004).

## VI.  CONCLUSION

The court has carefully and independently reviewed the record and concludes that, for the reasons given above, the decision of the Commissioner is REVERSED and REMANDED. A separate judgment will issue.

DONE this 3rd day of December, 2015.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE